**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

| | | |
|---|---|---|
| **KARLY A. DUNCAN,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:11CV00021 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: James P. Jones |
| **COMMISSIONER OF** | ) | United States District Judge |
| **SOCIAL SECURITY** | ) | |
| | ) | |
| Defendant. | ) | |

*Lewey K. Lee, Lee & Phipps, PC, Wise, Virginia, for Plaintiff. Eric Kressman, Regional Chief Counsel, Region III, Jillian Quick, Assistant Regional Counsel, Allyson Jozwik, Special Assistant United States Attorney, Office of the General Counsel, Social Security Administration, Philadelphia, Pennsylvania, for Defendant.*

In this social security case, I affirm the final decision of the Commissioner.

I

Plaintiff Karly A. Duncan filed this claim challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C.A.

§§ 401-433 (West 2011 & Supp. 2012) and 1381-1383f (West 2012). Jurisdiction of this court exists under 42 U.S.C.A. §§ 405(g) and 1383(c)(3).

Duncan applied for benefits on September 5, 2008, alleging disability since October 20, 2004. Her claims were denied initially and upon reconsideration. An administrative hearing was held before an administrative law judge ("ALJ"), at which Duncan, represented by counsel, and a vocational expert testified. The ALJ issued a decision finding that Duncan was not disabled on December 18, 2009. The Social Security Administration's Appeals Council denied Duncan's request for review and the ALJ's decision became the final decision of the Commissioner. Duncan then filed a complaint before this court seeking judicial review of the ALJ's decision.

The parties have filed cross motions for summary judgment, which have been briefed. The case is ripe for decision.

II

Duncan was only 25 years old at the alleged onset of disability, making her a "younger individual" as defined by the regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c) (2011). She graduated high school and attended approximately a year and a half of community college. Duncan has past relevant work as a pillow stuffer.

A. Physical Impairments.

Duncan was in a motor vehicle accident in October 2004 and sustained injuries to her neck, back, and right clavicle. Specifically, she had a fracture of the right clavicle and a fracture of the transverse process of L2 and L3.

In January 2005, Duncan underwent diagnostic arthroscopy on the right shoulder. Duncan received physical therapy in March and April of 2005. Treatment notes from Marco Berard, M.D., indicate that Duncan reported decreased pain and he discharged her in April 2005.

Duncan followed up with Olimpo Fonesca, M.D., in April 2005. Dr. Fonesca noted some decreased range of motion in her right shoulder due to pain. Her back was tender in the mid to lower lumbar and a paraspinal spasm was noted bilaterally. Dr. Fonesca also noted that Duncan had lost ten pounds since her last visit which Duncan attributed to increased activity due to better weather.

In October 2006, Duncan underwent diagnostic testing with Timothy McBride, M.D., which showed that her right shoulder was "unremarkable" and that her clavicle fracture was healed with no evidence of instability. (R. at 821, 886.) In December 2006, Dr. McBride noted that Duncan was on Lortab and that it was working "fairly well for pain." (R. at 885.)

Duncan did not seek treatment again until August 2007, when she was seen by Galileo Molina, M.D. Duncan reported she was taking only over-the-counter

medications for her pain. Dr. Molina noted that Duncan's pain complaints did not comport with her ability to move her shoulder and back. He noted that Duncan was able to abduct both arms more than 90 degrees without difficulty or hesitation of pain. Although Duncan reacted in pain when Dr. Molina lightly touched her right shoulder, she had been moving the shoulder up and down, front and forward with no evidence of pain. A seated straight leg raise was negative bilaterally with no difficulty or pain. Duncan reported working as a helper cleaning house.

In March 2009, Duncan underwent a consultative examination by Kevin Blackwell, D.O. The physical examination was relatively benign. All range of motion tests were within normal limits. Dr. Blackwell noted tenderness of the knee with palpitation and tenderness of the lumbar and thoracic spine. He opined that Duncan would be able to lift 30 pounds occasionally and 20 pounds frequently, sit for 8 hours in an 8-hour period, and stand for 4 hours in an 8-hour period. He also opined that Duncan is able to bend and kneel up to two-thirds of the day and squat up to one-third of the day, but that she must avoid repetitive stooping, crawling, stair-stepping, climbing of ladders, and exposure to unprotected heights.

Shirish Shahane, M.D., a state agency consultant physician, reviewed the record in March 2009. He concluded that Duncan could lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk for 6 hours in an 8-hour period;

sit for 6 hours in an 8-hour period; occasionally climb, balance, stoop, kneel, crouch, crawl, and should avoid concentrated exposure to hazards. This opinion was confirmed by Joseph Duckwall, M.D.

In April 2009, Duncan sought treatment at the Mountain View Regional Medical Center after a fall. Physical examination showed no acute distress, back was normal with no tenderness, neck had no tenderness and full range of motion, and arms and legs had no tenderness and full range of motion.

Duncan saw Dr. Molina again in April 2009. She reported that she was taking only over the counter pain medication. Dr. Molina noted that Duncan over-reacted with palpitation of her back. Duncan also jerked and claimed that the axial loading test caused her severe pain even though it was just light tapping. The straight leg raise was negative. Dr. Molina prescribed pain medication and advised her to return in three months.

From May to October 2009, Duncan was treated by Jody Bently, M.D. She complained of back, shoulder, and knee pain. Examination showed that her neck and arms and legs were normal. She was prescribed Lortab and Flexeril and she reported that the medication helped with the pain. In Otober 2009, Dr. Bently would no longer prescribe Duncan narcotic pain medication because Duncan had been non-compliant with the pill-count requirements. She did not return to him for treatment.

In October 2009, Crystal Compton, D.O., completed an "Assessment of Ability to Do Work-Related Activities (Physical)." Dr. Compton concluded that Duncan is able to lift 8 to 10 pounds occasionally and 3 pounds frequently; stand/walk for 2 hours in an 8-hour day, for 20 minutes at a time; sit for 8 hours in an 8-hour period; and occasionally climb, stoop, kneel, balance, crouch, or crawl. Dr. Compton also imposed limitations on pushing, pulling and exposure to moving machinery. Finally, Dr. Compton concluded that Duncan's impairments would result in frequent absenteeism, more than 2 days a month.

## B. Mental Impairments.

The evidence shows that Duncan is able to care for herself, watch television, do chores around the house, pay bills, drive a vehicle, and prepare snacks. She goes shopping and out to eat on occasion. She visits and talks with relatives, including her sons, and has friends.

Duncan has apparently been prescribed Xanax for anxiety for some time. Throughout her treatment by Dr. Fonesca and Rebecca Mullins, FNP, she was prescribed Xanax for reported anxiety. In January 2005, her first appointment with the practice, she was also referred to a therapist for her depression. She reported that treatment with the therapist had "helped tremendously." (R. at 337.) When she was examined for her mental health, she appeared essentially normal. She was

oriented to person, place, and time; her interaction was cooperative; her eye contact was good; and her thought processes were goal oriented.

In March 2006, Duncan was admitted for a short time on a temporary detention order. She denied any suicidal ideation, but admitted to problems with addiction to medication. Upon discharge, she was diagnosed with depression, NOS and given a global assessment of functioning ("GAF") score of 60.

Duncan was referred to Wise County Behavioral Health. After missing her first appointment, she was seen in April 2006. Her mood was euthymic and her affect was pleasant. She denied suicidal ideation and was prescribed Klonopin, Clonidine, and Geodon. In May 2006, Duncan was seen by Randall Pitone, M.D., a psychiatrist. The mental status examination showed that Duncan was alert and oriented with a moderately depressed and anxious mood and affect. Her insight and judgment were within normal limits. Dr. Pitone gave Duncan a GAF score of 40-45, indicating serious symptomatology. He diagnosed major depressive disorder and possible bipolar disorder.

Duncan was treated by Uzma Ehtesham, M.D., approximately once per month, from September 2008 through October 2009. Dr. Ehtesham diagnosed Duncan with bipolar disorder and depression and gave her a GAF score of 60. This assessment generally continued throughout her treatment. Dr. Ehtesham's notes show that Duncan exhibited anxiety and sadness but indicate that multiple

symptoms, such as anger, agitation, and racing thoughts have decreased. Dr. Ehtesham prescribed medication and in August 2009 he noted that Duncan was doing "fairly well" and that her depression and anger had lessened. (R. at 716.)

Dr. Ehtesham completed multiple "Assessment of Ability to Do Work-Related Activities (Mental). In each of the forms, Dr. Ehtesham opined that Duncan is permanently disabled. He also opined that she has marked or extreme limitations in all aspects of functioning.

In March 2009, state agency psychologist Richard Milan, Jr., Ph.D., reviewed the record and concluded that Duncan could perform simple work. Dr. Milan noted that Dr. Ehtesham's opinion overestimated Duncan's limitations and that said limitations were inconsistent with the evidence. Dr. Milan stated, "The psychiatrist's own records fail to reveal the types of significant clinical and laboratory abnormalities one would expect if the claimant were disabled." (R. at 598.) In July 2009, state agency psychologist Louis Perrott, Ph.D., reviewed the record and generally concurred with Dr. Milan.

### C. Hearing and ALJ Decision.

At the administrative hearing, Duncan testified about her prior relevant work as a pillow stuffer. She testified that she did not lift more than 10 pounds in that work.

The ALJ posed a hypothetical to the vocational expert of a person with Duncan's background and the following limitations: lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk for 6 hours in an 8-hour period; sit for 6 hours in an 8-hour period; occasionally climb, balance, stoop, kneel, crouch, crawl, and should avoid concentrated exposure to hazards. The ALJ also included mental impairment limitations of only simple, routine, or repetitive tasks and only occasional interaction with the public. The vocational expert responded that Duncan would be able to perform her past relevant work as a pillow stuffer and other jobs existing in significant numbers in the national economy.

In his decision, the ALJ found that Duncan has the severe impairments of degenerative disc disease, degenerative joint disease of the right shoulder, depression with bipolar, and anxiety. He found that none of these impairments met or medically equaled listing level severity. The ALJ concluded that Duncan had the residual functional capacity to perform light work with the various restrictions, including the mental restrictions, outlined in the hypothetical given to the vocational expert. Based on the evidence and the testimony of the vocational expert, the ALJ found that Duncan could perform her past relevant work and other work existing in significant numbers in the national economy and, therefore, was not disabled.

Duncan argues that the ALJ's decision is not supported by substantial evidence. For the reasons stated below, I disagree.

III

The plaintiff bears the burden of proving that she is under a disability. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). The standard for disability is strict. The plaintiff must show that her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.A. §§ 423(d)(2)(A); 1382c(a)(3)(B).

In assessing disability claims, the Commissioner applies a five-step sequential evaluation process. The Commissioner considers whether the claimant: (1) has worked during the alleged period of disability; (2) has a severe impairment; (3) has a condition that meets or equals the severity of a listed impairment; (4) could return to her past relevant work; and (5) if not, whether she could perform other work present in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4) (2011). If it is determined at any point in the five-step analysis that the claimant is not disabled, the inquiry immediately ceases. *Id*. The fourth and fifth steps of the inquiry require an assessment of the claimant's residual functional

capacity ("RFC"), which is then compared with the physical and mental demands of the claimant's past relevant work and of other work present in the national economy. *Id.*; *Johnson v. Barnhart*, 434 F.3d 650, 653-54 (4th Cir. 2005).

In accordance with the Act, I must uphold the Commissioner's findings if substantial evidence supports them and the findings were reached through application of the correct legal standard. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). Substantial evidence is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). It is the role of the ALJ to resolve evidentiary conflicts, including inconsistencies in the evidence. *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). It is not the role of this court to substitute its judgment for that of the Commissioner. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).

Duncan argues that the ALJ erred in giving less weight to the opinions of Drs. Compton and Ehtesham. Because these opinions were not accorded their proper controlling weight, Duncan asserts, the ALJ's RFC determination is not supported by substantial evidence.

The ALJ did not err in according less weight to the opinions of Drs. Compton and Ehtesham. A treating physician's opinion on the nature and severity of the impairments is to be given controlling weight only where the ALJ finds that the opinion "is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2011).

Dr. Compton's restrictive assessment of Duncan's physical abilities is inconsistent with the evidence as a whole. The evidence shows that while Duncan did suffer from injuries to her neck, back, and shoulder in the 2004 car accident, those injuries healed well. Examinations have shown normal range of motion and only slight tenderness in the affected areas.[1] In the past, Duncan has gone for long periods without treatment, other than over-the-counter pain medication. Dr. Compton's opinion also conflicts with the opinions of Dr. Blackwell and the two state agency physicians. The ALJ properly accorded Dr. Compton's opinion less weight.

Similarly, Dr. Ehtesham's opinion is inconsistent with the evidence as a whole and his own treatment notes. The evidence as a whole shows that although Duncan suffers from depression with bipolar disorder and anxiety, she has

---

[1] The exceptions to this are Duncan's visits to Dr. Molina when she evidenced strong reactions to touch and palpitation. Dr. Molina felt that Duncan was overreacting and found essentially no evidence of a physical cause of the pain.

-12-

responded to treatment and drug therapy and her symptoms have improved. Dr. Ehtesham himself consistently gave Duncan a GAF score of 60, which is at odds with the marked and extreme limitations he gave in her assessments. As Dr. Milan, one of the state agency psychiatrists observed, Dr. Ehtesham's records "fail to reveal the types of significant clinical and laboratory abnormalities one would expect if the claimant were disabled." (R. at 598.) Also, Dr. Ehtesham's opinion that Duncan is permanently disabled is entitled to no weight as it is an opinion on an issue reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d) (2011).

Substantial evidence supports the ALJ's determination in Duncan's case. Duncan's physical and mental limitations do not preclude her from doing light work with the limitations articulated by the ALJ.

IV

For the foregoing reasons, the plaintiff's Motion for Summary Judgment will be denied, and the defendant's Motion for Summary Judgment will be granted. A final judgment will be entered affirming the Commissioner's final decision denying benefits.

DATED: June 17, 2012

/s/ James P. Jones
United States District Judge